# In the United States Court of Federal Claims

OFFICE OF SPECIAL MASTERS
No. 14-984V
Filed: October 18, 2016

**FILED**
**OCT 18 2016**
OSM
U.S. COURT OF
FEDERAL CLAIMS

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

| | |
|---|---|
| GAENA MARIE LANEY, | * For Publication |
| | * |
| Petitioner, | * |
| v. | * Interim Attorney's Fees and Costs; |
| | * Contested; Reasonable Basis. |
| SECRETARY OF HEALTH | * |
| AND HUMAN SERVICES, | * |
| | * |
| Respondent. | * |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

*Gaena Laney, pro se, Greenbrier, TN.*
*Adriana Teitel, United States Department of Justice, Washington, DC, for respondent.*
*Andrew D. Downing, Van Cott & Talamante, Phoenix, AZ, former counsel for petitioner.*

## DECISION GRANTING IN PART AND DENYING IN PART ATTORNEY'S FEES AND COSTS[1]

**Roth,** Special Master:

On October 14, 2014, Gaena Laney ("Ms. Laney" or "petitioner") filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. § 300aa-10, *et seq.*[2] (the "Vaccine Act" or "Program"). Petitioner alleged that on the night that she received the tetanus toxoid vaccination she began "running a fever," and "she began experiencing blurred vision, and pressure and pain at the site of the injection." *See* Petition ("Pet."), ECF No. 1, at 1. "She complained of radiation to her left arm and pain in her neck, describing it as burning that occurred constantly." *Id.* She also complained of "numbness and tingling" as a result of a tetanus toxoid vaccine received on January 16, 2013. *Id.* Petitioner further alleged that she "continues to

---

[1] Because this unpublished decision contains a reasoned explanation for the action in this case, it will be posted on the United States Court of Federal Claims' website, in accordance with the E-Government Act of 2002 (codified as amended at 44 U.S.C. § 3501 note (2012)). In accordance with Vaccine Rule 18(b), petitioner has 14 days to identify and move to delete medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will delete such material from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755 (1986). Hereinafter, for ease of citation, all "§" references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2012).

have sharp and severe jaw, ear and chest pain," and that "sometimes the burning sensation travels up her face, sometimes it crawls along her scalp, and sometimes it burns her neck." *Id.* at 2. Petitioner's counsel moved to withdraw as counsel; he now seeks an award for interim attorney's fees and costs pursuant to Section 15(e) of the Vaccine Act. After careful consideration, the undersigned has determined to **grant the request in part and deny the request in part** for the reasons set forth below.

## I. Facts.

Petitioner was born on April 11, 1968. She was a homemaker at the time of the allegedly causal vaccine. Petitioner's medical history included complaints of chest pain, mitral valve prolapse, reactive airway disease, and shortness of breath. Pet. Ex. 3 at 58, 64; Pet. Ex. 4 at 7; Pet. Ex. 5 at 109, 112. Petitioner has an extensive history of allergic reactions, including but not limited to: hydrocodone, sulfa, penicillin, egg, latex, potassium iodide, iodine, acetaminophen, codeine, sodium iodide, and propoxyphene hcl (Darvon). Pet. Ex. 3 at 12.

On January 15, 2013, petitioner was prescribed doxycycline to treat an infected piercing. Pet. Ex. 3 at 11, 12; Pet. Ex. 5 at 130. The next day, January 16, 2013, petitioner visited her primary care physician ("PCP") at FirstCare Mission & Crossover Clinic and received a tetanus toxoid vaccine in her left deltoid. Pet. Ex. 3 at 12.

On January 23, 2013, petitioner returned to her PCP with a "poss allergic reaction. The onset was 5 day(s) ago. Location is throat. No radiation. The patient describes it as pressure. It occurs daily. Status: worse. She is also experiencing – choking/pressure – blurred vision. Pertinent negatives include – airway constriction – pain – dysphagia – headache. Pt experiencing poss allergic reaction. Has recently taken Doxycycline & received tetnus (sic) shot, now feels pressure on/around throat. Pt states she is having trouble swallowing. Pt has dentures and states dentures are making her throat feel worse." Pet. Ex. 3 at 10.

On February 7, 2013, petitioner returned to her PCP with "allergic reaction. The onset was 3 week(s) ago. Location is neck. There is radiation to left arm. The patient describes it as burning. It occurs constantly. Status: no change. She is also experiencing – burning – numbness/tingling. Pt is still experiencing 'burning' feeling on the L side of her neck radiating to her left arm which she attributes to the tetanus injection she received 3 wks ago. States another physician advised having a steroid injection or oral steroids." Pet. Ex. 3 at 7. Petitioner may or may not have had a rash on her neck; the record is unclear, as it notes "No impressive skin lesions present. Rash is described as eryth, maculopapular, red in color, neck." *Id.* at 8. Prednisone was prescribed. *Id.* at 8.

On February 9, 2013, petitioner presented to the emergency department at Washington Regional Medical Center ("WRMC") with a chief complaint of having weakness, dizziness and lightheadedness, throat pain, swelling on the left side, headache, and neck pain. Pet. Ex. 5 at 126. It was noted that she had a tetanus shot 3 weeks before and was worried that her symptoms were from that. *Id.* She had taken prednisone the night before and believes that the prednisone aggravated her symptoms. *Id.* She indicated that she felt unsteady. *Id.* She noted gradual onset and worsening symptoms. *Id.* She noted being shaky in the morning. *Id.* at 130. She was

concerned that she was having a "possible anaphylactic reaction from tetanus shot received on January 16 this year or possible medical reaction to doxycycline started for prophylactic against possible infection of piercings." *Id.* A full work up was performed, and petitioner was diagnosed with viral syndrome before being discharged home. *Id.* at 126-64.

On February 13, 2013, petitioner returned to the emergency room at WRMC, complaining of "aching pain, L neck, Pt. reports she had tetanus reaction x 1 month ago with subsequent reaction to doxycycline. Pt. came to the ER over the weekend and was diagnosed with viral syndrome. Pt. report (sic) she has continued neck stiffness and is extremely anxious. Pt. was given Ativan 0.5 mg for home but patient said she began to 'see double' while on the medication and believes she should no longer take it." Pet. Ex. 5 at 92. Apparently the "Pt. left treatment area without notifying personnel and did not return." *Id.* at 92.

On that same day, petitioner returned to her PCP for hospital follow up. Petitioner was seen at "WRMC ER for allergic rxn to prednisone. Pt states prednisone caused extreme palpitations. Pt was given IV Ativan at the hospital and states she doesn't remember anything after med was administered. She was also D/C with rx for Ativan which she states she took Sun night and it caused her to have double vision. Pt states has had fever, chest pain, and shakiness since being D/C from hospital and still c/o radiating pain on L side." Pet. Ex. 3 at 4. "Assessment/Plan: urinary tract infection acute, prednisone adverse reaction." *Id.* at 5.

Petitioner returned to the emergency department two days later on February 15, 2013; records state, "pt left prior to being seen." Pet. Ex. 5 at 91. Four days after that, on February 19, 2013, petitioner again presented to her PCP, complaining of chest pain. Pet. Ex. 3 at 40.

Petitioner then visited the emergency department on February 28, 2013, complaining of intermittent palpitations, but denied chest pain. Pet. Ex. 5 at 63-64. A nurse noted, "pt had stomach virus and high fever on Monday [February 25, 2013]." *Id.* at 69. Petitioner also complained of shooting pains in her left arm and dizziness. *Id.* A full work up was performed including an EKG and metabolic panel. Petitioner was discharged without a diagnosis and told to follow up with her PCP in the morning. *See generally* Pet. Ex. 5 at 63-87.

Petitioner did not visit her PCP or the emergency department again until June 22, 2013, when she presented to the emergency department at WRMC complaining of chest and neck pain. *See generally* Pet. Ex. 5 at 9-43. A chest x-ray was performed, which was normal. *Id.* A comprehensive metabolic panel was performed and was also normal. Petitioner was discharged with a diagnosis of chest wall strain and cervical radiculopathy. *Id.* at 16. An outpatient MRI was ordered, and petitioner was instructed to follow up with her PCP. *Id.*

Petitioner presented to WRMC on June 28, 2013 for an x-ray of her sinuses due to a history of metal in her eye. The x-ray was normal. Pet. Ex. 5 at 50. An MRI without contrast of her cervical spine for neck pain was also performed. The results were normal. *Id.* at 50-51.

Petitioner returned to her PCP four days later, on July 2, 2013, complaining of constant pain in the left side of her neck that radiated into her jaw, as well as burning and pressure. Pet. Ex. 3 at 13. She reported that the pain was a reaction to the tetanus vaccine. *Id.*

3

Petitioner subsequently presented to MANA Fayetteville Diagnostic Clinic ("FDC") for neurological workup at the request of her PCP on July 17, 2013, for facial burning, neck pain, pain in limb and facial pain. Pet. Ex. 4 at 3, 12 and 13. Several tests were performed, including a blood draw, sedimentation rate, and C-reactive protein, as well as vitamin B12 and folate tests. Pet. Ex. 4 at 13.

In a letter to petitioner's PCP following the July 17, 2013 visit, Dr. Kaplan of FDC wrote that he had seen petitioner for a neurological consultation for a number of symptoms following a tetanus booster. Pet. Ex. 4 at 16-17. He noted that her chief complaints included severe clenching pain in her neck area, her neck feeling swollen, burning from her cheek to her collarbone, and pain in her left upper arm. *Id.* She also had shooting pains in her legs. *Id.* Dr. Kaplan noted that he had reviewed all tests performed so far and had never seen anything like her complaints before. *Id.*

Dr. Kaplan ordered an MRI of the brain for complaints of "facial burning, left arm, severe neck spasm from tetanus shot, 01-16-13." The MRI performed on July 25, 2013 was unremarkable. Pet. Ex. 4 at 19.

Petitioner returned to FDC on August 8, 2013, for a "follow up of neck pain." Pet. Ex. 4 at 10. The assessment on that date was "pain in limb." Pet. Ex. 4 at 11.

Petitioner again visited FDC on September 23, 2013, for follow up of "numerous neuro sx." Pet. Ex. 4 at 8. It was noted that petitioner's "(P)roblem was listed as: 1. Severe clenching pain in her neck area – this is a little improved. 2. Neck feels swollen – this continues but to a lesser degree. 3. Pain in her anterior neck – this continues but also to a lesser degree. 4. Pain in her left upper arm that is aching and shooting, as well as burning in her cheeks down to her collarbone. These are improved a bit. She is now reporting some random twitching in her left upper eyelid about 2 times a day that lasts about a minute or two." *Id.* at 14. The assessment/plan on that date was "Pain in limb" and "Cervical pain (neck)." *Id.* at 9. Advil was recommended. *Id.*

## II.  Procedural History.

This case was filed on October 14, 2014 and was initially assigned to now-Chief Special Master Dorsey.[3] ECF No. 1, 4. Several medical records were filed the next day, October 15, 2014. Medical Records, Exhibits 1-5, ECF No. 5. A statement of completion was filed on October 17, 2014. Statement of Completion, ECF No. 6. An initial status conference was held on November 6, 2014, in which the special master asked the parties to consider informal settlement discussions, based upon the medical records that had been filed and "given that petitioner's condition was improving." Scheduling Order, ECF No. 9. The parties agreed to discuss settlement, and on December 1, 2014, petitioner transmitted a demand to respondent. Joint Status Report, ECF No. 13. Discussions continued and respondent apparently requested additional

---

[3] Special Master Dorsey was elevated to Chief Special Master on September 1, 2015.

medical records from petitioner before continuing settlement discussions. Joint Status Report, ECF No. 15.

Petitioner submitted additional medical records (Pet. Ex. 8-11) on February 19, 2015; April 1, 2015; April 8, 2015; and June 18, 2015. Medical Records, ECF Nos. 17, 21, 23, 26. Respondent filed her Rule 4(c) Report ("Rsp. Rpt.") on May 26, 2015, indicating that petitioner's alleged injury was not appropriate for compensation. Rsp. Rpt., ECF No. 24. Chief Special Master Dorsey held a Rule 5 status conference on June 25, 2015, in which she ordered the parties to submit expert reports. Scheduling Order, ECF No. 27. Petitioner's expert report was originally due by September 23, 2015; on September 21, 2015, petitioner filed a motion for extension of time ("First MFET") until October 23, 2015, to file her expert report. First MFET, ECF No. 29. The chief special master granted this motion.

This case was reassigned to me on October 21, 2015. Notice of Reassignment, ECF No. 32. Petitioner subsequently filed motions for extension of time to file her expert report on October 21, 2015; November 20, 2015; December 28, 2015; and January 19, 2016. All motions were granted. ECF Nos. 33-36. On February 17, 2016, petitioner's counsel filed an unopposed motion to withdraw as petitioner's attorney ("Motion to Withdraw"). Motion to Withdraw, ECF No. 37. This motion was granted on March 17, 2016. Order, ECF No. 38.

On April 21, 2016, Mr. Downing filed a motion for leave to file for interim attorney's fees and costs. Motion for Leave, ECF No.40. This motion was granted on May 4, 2016; Mr. Downing was instructed to file his application for attorney's fees and costs by no later than May 25, 2016. Order, ECF No. 42. On May 18, 2016, Mr. Downing filed a motion for attorney's fees and costs electronically; as petitioner was *pro se* at this point, this case had been removed from electronic filing and all subsequent filings were required to be in paper form. Therefore, Mr. Downing's application was struck from the docket and he was ordered to file his application for attorney's fees and costs in paper form by no later than May 25, 2016. Order, ECF No. 44.

Mr. Downing filed a Motion for Attorney's Fees ("Motion") on June 8, 2016, in paper form, requesting attorneys' fees and costs in the amount of $22,039.85. Motion, ECF No. 45. Respondent filed a Response ("Response") to Mr. Downing's Motion on June 27, 2016. Response, ECF No. 46. On July 7, 2016, Mr. Downing filed a Reply to Response to Motion ("Reply"). Reply, ECF No. 47. Mr. Downing filed a Supplement to the Motion for Attorney's Fees ("Supp. Motion") on August 26, 2016, requesting supplemental attorneys' fees and costs in the amount of $3,002.36. Motion 2, ECF No. 48.

This matter is now ripe for decision.

### III. Applicable Law.

In general, the Vaccine Act permits an award of reasonable attorneys' fees and costs. §15(e). Determining whether an application for fees is reasonable is a matter within the discretion of the presiding special master. *See Carrington v. Sec'y of HHS*, 85 Fed. Cl. 319, 322-23 (2008). Special masters are afforded considerable discretion when considering motions for

attorney fees. For instance, it is within a special master's discretion to reduce fees *sua sponte*, without warning to petitioners. *Sabella v. Sec'y of HHS*, 86 Fed. Cl. 201, 208-09 (Mar. 2, 2009).

## IV. Discussion.

Petitioner's former counsel properly filed a Motion for Interim Attorneys' Fees and Costs on June 8, 2016, requesting $21,188.50 in attorneys' fees and $851.35 in costs, for a total of $22,039.85. Motion at 1. In her response filed on June 27, 2016, respondent objected first to reasonable basis both at the time of filing and throughout the pendency of this case and second to the payment of interim fees and costs in this case. Respondent asserted that, should the special master decide to award interim fees, an appropriate award also would fall between $4,000.00 and $6,000.00. Response at 4-11. Mr. Downing filed a Reply on July 7, 2016. *See generally* Reply, ECF No. 47. Petitioner's former counsel argued that respondent's counsel was conflating the standard for "reasonable basis" with the standard for "likelihood of prevailing on the merits;" he also provided support for his interim fee award and objected to respondent's suggested fee range. Reply at 2-8. On August 26, 2016, Mr. Downing filed a Supplemental Motion requesting an additional $3,002.36 in attorneys' fees and costs for drafting and filing his Reply. *See generally* Motion 2.

### 1. Challenges to the interim nature of fees and costs.

Interim fees may be paid at the discretion of the special master. *See Avera v. Sec'y of HHS*, 515 F.3d 1343, 1352 (Fed. Cir. 2008) ("Interim fees are particularly appropriate in cases where proceedings are protracted and costly experts must be retained.") While they are not routinely awarded, interim fees may be awarded when petitioner's counsel withdraws from a case. *See, e.g., Woods v. Sec'y of HHS*, 105 Fed. Cl. 148, 154 (Fed. Cl. 2012). However, "the mere fact that an attorney plans to withdraw is not necessarily a hardship that triggers an award of interim attorneys' fees and costs." *McKellar v. Sec'y of HHS*, 101 Fed. Cl. 297, 302 (2011). As chambers has had difficulty in reaching Ms. Laney in order to schedule a status conference, I expect that counsel may have difficulties in getting Ms. Laney's cooperation now that he is no longer her attorney, and therefore it is appropriate to resolve Mr. Downing's attorneys' fees and costs at this time.

### 2. Challenges to reasonable basis.

The Vaccine Act permits an award of reasonable attorneys' fees and costs if the petition was "brought in good faith and there was a reasonable basis." 15(e)(1). Reasonable basis is typically viewed as "an objective standard determined by the 'totality of the circumstances.'" *Chuisano v. United States*, 116 Fed. Cl. 276, 286 (2014) (citations omitted). This somewhat amorphous standard has often been defined not by what it includes, but rather by what is lacking in cases in which a reasonable basis has been found not to exist. Typically, reasonable basis is not found when "fundamental inquiries are not made." *Di Roma v. Sec'y of HHS*, No. 90-3277, 1993 WL 496981, at *2 (Fed. Cl. Spec. Mstr. Nov. 18, 1993). Additionally, a case may have reasonable basis when filed, but may lose reasonable basis during the pendency of the case. *Perreira v. Sec'y of HHS*, 33 F.3d 1375, 1376-77 (Fed. Cir. 1994); *McNett v. Sec'y of HHS*, No. 99-684V, 2011 WL 760314, at *6. (Fed. Cl. Spec. Mstr. Feb. 4, 2011). Furthermore, the burden

lies with the petitioner to "affirmatively demonstrate a reasonable basis." *McKellar*, 101 Fed. Cl. at 305. Some of the factors considered when assessing reasonable basis include: "'the factual basis, the medical support, jurisdiction issues', and the circumstances under which a petition is filed." *Chuisano*, 116 Fed. Cl. at 288 (citing *Di Roma*, 1993 WL 496981, at *1). Neither the fact that no medical records or supportive expert opinion was filed nor the fact that the claim was filed beyond the statute of limitations automatically negates a finding of reasonable basis. *Chuisano*, 116 Fed. Cl. at 288 (citations omitted). Furthermore, "[a] looming statute of limitations does not forever absolve a petitioner from his or her obligation to proceed with a reasonable basis to support his claim, at least not if the petitioner hopes to recover any fees and costs." *Id.* at 287 (citations omitted).

In the present case, the undersigned finds that the petitioner had a reasonable basis for filing her claim. As the billing records demonstrate, petitioner sought representation from Mr. Downing on or about July 15, 2013, about 14 months before the petition was filed. Petitioner's counsel and his staff then obtained, reviewed, and summarized medical records requested and received for the petitioner's medical care following the January 16, 2013 tetanus vaccine through what appeared to be her final treatment in September of 2013. Counsel had numerous conversations with the petitioner, and based upon her complaints and the medical records received, correctly determined that there was sufficient information to suggest that Petitioner had a compensable case. Therefore, I find that petitioner's counsel fulfilled his duty to investigate the claim and did so through extensive discussions with petitioner, along with a review of the medical records in his possession.

More specifically, as set forth at length above in my analysis of the medical records that were in the possession of petitioner's attorney at the time the Petition was filed, following her tetanus vaccine, petitioner complained of left sided neck pain with pain in her left arm, the arm in which she received the vaccine. She likewise presented to the emergency room multiple times as well as to her primary care physician with ongoing complaints of burning and numbness/tingling of the left side of her neck, left arm, and chest as well as headaches. Petitioner also complained of tingling in her legs. She was also noted to have had a rash on her neck on the left side in approximately February of 2013 following her vaccination. Additionally, she was sent for neurological consultation by her primary care physician as a result of her complaints. A neurological work up by Dr. Kaplan was performed including MRI of the brain and a full metabolic panel. Her last visit with him was seemingly the examination of September 23, 2013.

Further, based upon the medical records filed in support of the petition, Chief Special Master Dorsey suggested, and respondent initially agreed, to entertain settlement discussions. In so doing, petitioner submitted a settlement demand to respondent and discussions ensued. At some juncture, respondent asked petitioner for additional medical records, which were supplied over a several month period during the winter and spring of 2015. Discussions apparently broke down after all of the additional requested medical records were provided, and respondent filed her Rule 4(c) report. Chief Special Master Dorsey then set a deadline for petitioner's expert report. Reasonable basis was not raised at any time. A review of the billing records shows that petitioner's counsel spoke with petitioner's treating physician as well as two experts thereafter. As soon as he learned that he would be unable to secure an expert, he filed to be relieved as counsel, but not before an apparent discussion with respondent's counsel. Motion at 16.

7

Based upon the medical records, petitioner had a reasonable basis upon which to file the petition, and upon learning he would be unable to secure an expert, Mr. Downing sought to be relieved as counsel.

### 3. **Challenges to amount of fees requested.**

In her response, respondent provided no specific objection to the amount requested or the hours worked in this matter, but instead offered a range which she believed reasonable for attorney's fees. Response at 3. Respondent "reminded" the Court of its discretion in awarding fees, quoting *Fox v. Vice*, and reiterated the fact that 'the determination of [attorneys'] fees "should not result in a second major litigation."' Response at 2-3. Respondent proceeded to claim that a "reasonable" amount for fees and costs in this case would fall between $4,000.00 and $6,000.00, without specifically addressing how that range applied to this particular matter.

Mr. Downing has over twenty years of litigation experience and has been practicing in the Program for over fourteen years. *Al-Uffi v. Sec'y of HHS*, No. 13-956V, 2015 WL 6181669, at *11 (Fed. Cl. Spec. Mstr. Sept. 30, 2015). Mr. Downing submitted an hourly rate of $350 for himself, $195 for Jordan Redman, $195 for Justin Redman, $100 for Robert Cain and $100 for Danielle Avery; the rates remained consistent over the three years since Mr. Downing undertook representation of the petitioner. Motion for Fees at 34. The submitted rates have been upheld in a number of recent decisions by multiple special masters. *See e.g. Uscher v. Sec'y of HHS*, No. 15-798V, 2016 WL 3670518 (Fed. Cl. Spec. Mstr. June 15, 2016); *Allicock v. Sec'y of HHS*, No. 15-485V, 2016 WL 3571906 (Fed. Cl. Spec. Mstr. May 26, 2016). Mr. Downing's hourly rates have been approved several times this year, falling into the *McCulloch* ranges for his tenure (approximately $350 to $425 for attorneys practicing for 20 or more years). *McCulloch v. Sec'y of HHS*, No. 09-293V, 2015 WL 5634323, at *19 (Fed. Cl. Spec. Mstr. Sept. 1, 2015) *motion for recons. denied*, 2015 WL 6181910 (Fed. Cl. Spec. Mstr. Sept. 21, 2015). I have awarded Mr. Downing this rate as well in a past decision. *See Evans v. Sec'y of HHS*, No. 12-706, 2016 WL 4434826 (Fed. Cl. Spec. Mstr. July 29, 2016). Hourly rates for both Mr. Jordan Redman and Mr. Justin Redman have also been approved as "consistent with prevailing views among the special masters." *Nichols v. Sec'y of HHS*, No. 14-1103V, 2016 WL 4272356 (Fed. Cl. Spec. Mstr. June 22, 2016); *see also Morris v. Sec'y of HHS*, No. 15-1466V, 2016 WL 4366799 (Fed. Cl. Spec. Mstr. July 26, 2016)(finding an hourly rate of $195 for Jordan Redman reasonable and consistent with previous rates). Accordingly, I find that the hourly rates billed by Mr. Downing and his associates are reasonable.

Overall, I find that the hours billed for this matter are reasonable, with the following exceptions. A review of the billing records reveals overbilling by paralegal Robert Cain, who billed 78 minutes for reviewing emails from petitioner, 12 minutes for leaving a voicemail, and 24 minutes each for two telephone calls to a healthcare provider to check on the status of record requests. Motion for Fees at 21, 23. The amount of time spent accomplishing these tasks appears excessive and there is no explanation given as to why so much time would have been spent on these items. Therefore, I have reduced this billing as follows: 30 minutes to review emails from petitioner, 2 minutes for leaving a voicemail, and 5 minutes each for the telephone calls to

medical providers to check on the status of the requested medical records. This reduces the respective billing from **$230 to $70.**

Mr. Downing himself billed 11 hours on the phone with petitioner from July 2013 to October 2014 – before the petition was filed. While some of these calls were for the purpose of gathering medical records, some of the calls were simply status updates on petitioner's claim. It is difficult to see how petitioner could require extensive updates on the status of her claim when it had yet to be filed. Accordingly, his hours billed for those telephone calls are reduced from 11 to 5 in total, thereby reducing the respective fees billed from **$3,850 to $1,750.**

Additionally, Mr. Downing billed 7.5 hours for reading and analyzing respondent's response to his application for fees and costs and drafting his reply brief. Supp. Motion, Ex. B at 1. Because Mr. Downing has previously responded to challenges on reasonable basis, the hours billed will be reduced from 7.5 to 5; the total supplemental fees and costs are therefore reduced from **$3,002.36 to $2,127.36**.

In sum, Mr. Downing requested $22,039.85 in fees and costs in his first fee application; this has been reduced to $19,779.85. Mr. Downing requested $3002.36 in fees and costs in his supplemental fee application; this had been reduced to $2,127.36. Therefore, the total amount of fees and costs awarded for this matter is $21,907.21.

## V. Total Award Summary.

For the reasons contained herein, **a check in the amount of $21,907.21[4] made payable jointly to petitioner, Gaena Laney, and petitioner's former counsel of record, Andrew D. Downing, for petitioner's attorneys' fees and costs shall be issued.**

The clerk of the court shall enter judgment in accordance herewith, and transmit this decision to Mr. Downing.[5]

**IT IS SO ORDERED.**

x /s/ Mindy Michaels Roth
Mindy Michaels Roth
Special Master

---

[4] This amount is intended to cover all legal expenses incurred in this matter. This award encompasses all charges by the attorney against a client, "advanced costs," as well as fees for legal services rendered. Furthermore, 42 U.S.C. § 300aa-15(e)(3) prevents an attorney from charging or collecting fees (including costs) that would be in addition to the amount awarded herein. *See generally Beck v. Sec'y of HHS*, 924 F.2d 1029 (Fed. Cir. 1991).

[5] Entry of judgment can be expedited by each party's filing of a notice renouncing the right to seek review. *See* Vaccine Rule 11(a).